IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 4, 2011

**MARKESE BROOKS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 05-05703     James M. Lammey, Jr., Judge**

**No. W2010-01673-CCA-R3-PC  - Filed December 8, 2011**

The petitioner, Markese Brooks, appeals the post-conviction court's denial of his petition for post-conviction relief, arguing he received the ineffective assistance of counsel. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Ebony N. Dawkins, Memphis, Tennessee, for the appellant, Markese Brooks.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Kevin Rardin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted of first degree felony murder and attempted especially aggravated robbery by a Shelby County Criminal Court jury and was sentenced to an effective term of life imprisonment in the Department of Correction. This court affirmed the judgments of the trial court on direct appeal, and the Tennessee Supreme Court denied his application for permission to appeal. See State v. Markese Alexander Brooks, No. W2007-02595-CCA-R3-CD, 2008 WL 4648366 (Tenn. Crim. App. Oct. 21, 2008), perm. to appeal denied (Tenn. Mar. 16, 2009). The underlying facts of the case were recited by this court on direct appeal as follows:

On the evening of January 17, 2005, fifty-three-year-old Albert Covington was shot to death as he struggled with a shotgun-wielding assailant who was attempting with two accomplices to rob the Little Star Grocery at 547 Vance Avenue in Memphis, where the victim was employed as store manager. The sixteen-year-old [petitioner], hospitalized that same evening for shotgun wounds, admitted his involvement to police in an initial oral interview conducted at the hospital and in a written statement given the next day at the homicide office. He and two codefendants, Clarence Anthony Abernathy and Frank DeAngelo Taylor, were subsequently indicted for the first degree felony murder and attempted especially aggravated robbery of the victim. The codefendants' cases were eventually severed, and the [petitioner] was tried and convicted of the offenses in July 2007.

**Suppression Hearing**

Prior to trial, the [petitioner] filed a motion to suppress his statements to police. At the November 20, 2006, suppression hearing, Sergeant T.J. Helldorfer of the Memphis Police Department's Homicide Bureau testified that he and Sergeant Miller interviewed the [petitioner] in his hospital room on January 18, 2005. Kim Weiss, a guardian ad litem from juvenile court, was present for the interview at his request because the officers had been unsuccessful in their attempts to reach the [petitioner]'s parents or guardian. After ascertaining from the attending nurse that the [petitioner] had suffered only a superficial wound and was not under the influence of any drugs, he and Sergeant Miller went over the <u>Miranda</u> warning with him, having him first read a portion of it aloud to ensure themselves of his ability to read. Weiss then went over the warning with the [petitioner] as well, reading each line "very slowly" and explaining the rights to the [petitioner] as she went through the document. The [petitioner] exhibited no difficulty reading, indicated that he was willing to talk to the officers, and signed the waiver of rights form. He then gave an oral statement admitting his involvement in the shooting.

Sergeant Helldorfer testified that the [petitioner] agreed to have his oral statement reduced to writing in a follow-up interview that took place the next day at the homicide office. Before beginning the interview, he went over the <u>Miranda</u> rights with the [petitioner] again and the [petitioner] signed another waiver of rights form indicating that he was willing to talk to the officers about the crimes. Neither the guardian ad litem nor the [petitioner]'s parent or guardian was present for the second interview. However, during the interim between the interviews, police officers had been in contact by

telephone with both the [petitioner]'s mother, who lived in California, and with his aunt, who was his Memphis guardian. Sergeant Helldorfer testified that each woman gave her consent for the officers to speak further with the [petitioner] on the basis that they did not "want him to take a charge alone."

Sergeant Helldorfer testified that the [petitioner] reviewed his written statement and then initialed each page and signed the end of the document at 2:03 p.m. on January 19, 2005. He said the [petitioner] gave no indication during either interview that he wished to stop talking or wanted to have an attorney or parent present. The [petitioner] appeared to understand what he was doing and did not appear to be under the influence of any intoxicants. On cross-examination, Sergeant Helldorfer acknowledged that the guardian ad litem was not an attorney and that he never spoke with the [petitioner]'s physician about the [petitioner]'s medical condition.

At the conclusion of the hearing, the trial court noted, among other things, that the [petitioner] was within two weeks of his seventeenth birthday at the time the statements were made, had completed the tenth grade, had an I.Q. of 95, and was employed at the Family Dollar Store. Applying the totality of the circumstances test as outlined in State v. Callahan, 979 S.W.2d 577 (Tenn. 1998), the trial court concluded that the statements had been freely and voluntarily made and accordingly denied the [petitioner]'s motion to suppress.

**Trial**

Ella Neal, the victim's half-sister, testified that she was working at the Little Star Grocery with the victim on January 17, 2005. She said that the victim had been robbed in the past and consequently carried a handgun in his back pocket when he worked. At about 7:30 p.m., three young men entered the store at a time when there were no other customers present. Two stayed in the front while the third walked all the way around the store before announcing that he did not have enough money. The three men left but returned twice more. The third time they entered the store, one stood in front of the drink box, one stood by the door, and the third approached the victim and said, "This is a stick up, give me your money." When the victim replied that he did not have any money, the man pulled out a sawed-off shotgun. The victim grabbed it, and a struggle between the two men ensued. During that time, Neal ran to the phone, dialed 9-1-1, dropped the phone, ran behind the potato chip rack, and "hit the floor."

Neal testified that she was "curled up in a knot" on the floor when she heard a series of gunshots, followed by a moment of silence and two loud moans from the victim. She lay still, too frightened to move, until she heard other customers coming into the store, at which point she got up and called 9-1-1 again. Later, after the police had responded, she tried to open the cash register and found that the drawer was jammed shut. On cross-examination, she acknowledged that she had positively identified one of the robbers from a photographic spreadsheet but had been unable to identify the [petitioner].

Nineteen-year-old Clarence Abernathy testified that the charges against him were still pending and that he was currently housed in the jail awaiting trial. He said that on the morning of January 17, 2005, he was playing basketball in the Foote Homes area of South Memphis with the [petitioner] and Frank Taylor, both of whom he knew from the neighborhood, when Taylor said that he wanted to rob someone. Abernathy stated that he jokingly responded that they should rob a store, immediately letting the others know that he was only kidding. Taylor, however, said that he was "for real" and looked at the [petitioner], who "nodded his shoulders" in agreement. Two other young men from the neighborhood, Elgie Busey and Deandre Crowder, were present and overheard the conversation.

Abernathy testified that he told Taylor and the [petitioner] that they were crazy and went home. Later that same day, he met up with them again at "The Yellow Store," a neighborhood grocery, and accompanied them to Foote Homes, where they sat in the gazebo until early evening when the [petitioner] suggested that they go to the Little Star Grocery. According to Abernathy, neither the [petitioner] nor Taylor had said anything more about robbing anyone. He said that he, Busey, and Crowder walked with the [petitioner] and Taylor to the store and that Busey remained outside while the rest of them went in. Once inside, Abernathy grabbed a drink from the drink box, carried it to the counter, and was in the process of reaching for his money to pay when he heard the [petitioner], who had approached the victim in the back of the store, say, "This is a stick up." He then heard Neal say, "Don't shoot." When he looked over, he saw the [petitioner] standing behind the victim with a shotgun at the victim's back.

Abernathy testified that the victim turned around and tried to grab the shotgun from the [petitioner]. As the two wrestled over the weapon, Taylor began shooting a .22 handgun at the victim. Next, the victim grabbed the shotgun from the [petitioner], the [petitioner] grabbed the victim's gun from

-4-

his back pocket, the [petitioner] shot the victim with the victim's handgun, and the victim shot the [petitioner] in the chest with the [petitioner]'s shotgun.

After the victim shot the [petitioner], Abernathy fled to a vacant apartment, a regular gathering spot, followed closely by the others. When the [petitioner] came in, he kept repeating that he had been hit and that "it ain't go right." Abernathy stated that he went home at that point but did not call the police because he was afraid someone would harm him or his family if he did. He claimed that he had been unaware that the [petitioner] and Taylor had their respective weapons with them when they went to the store, although he had seen both of them with the weapons in the past. He said he was arrested two days later and gave a statement to police that was consistent with his trial testimony. Finally, he stated that he was testifying against the [petitioner] because the victim, whom he had known as "Uncle Sonny," had been kind to him. On cross-examination, he denied that he had been promised anything in exchange for his testimony and reiterated that he had known nothing about the plan to rob the store.

Officer Nathan Newman of the Memphis Police Department testified that, when he and his partner responded to the scene, they found the victim lying on his stomach on top of a single-barrel shotgun with blood seeping out from underneath his body.

Officer Randall Fuller of the Memphis Police Department, who was assigned to the crime scene investigation unit in January 2005, identified the weapon recovered from the store as a twelve-gauge shotgun and the casing recovered from it as a twelve-gauge "field-load, possibly some type of bird-shot." He also identified a weapon that was found on the ground outside the store as a six-shot .357 Magnum revolver containing three live and three spent rounds.

Kelley Moore, a paramedic with the Memphis Fire Department, testified that the victim was dead when she responded to the scene. She said that approximately twenty minutes later, her dispatcher called for an ambulance to be sent to Fire Station 8 on Mississippi Boulevard in response to a walk-in gunshot wound. When she and her partner responded to that scene, located one-half mile from the Little Star Grocery, they found the [petitioner] with what appeared to be a superficial gunshot wound to the chest caused by "bird spray from shotgun pellets."

Officer Vernon VanBuren of the Memphis Police Department, a crime scene investigation officer, identified, among other things, a California identification card in the [petitioner]'s name that was given to him when he responded to the Mississippi Boulevard fire station on January 17, 2005.

Lieutenant Mark Miller of the Memphis Police Department's homicide bureau testified that on the morning of January 18, 2005, Sergeant Luckett assigned him and Sergeant Helldorfer to interview the [petitioner] in his hospital room at the Regional Medical Center. He described the interview process, including the role played by the guardian ad litem, and said that the [petitioner] told them that he was shot during the robbery, in which "Buck" and another person he did not know participated. Because the officers did not have the equipment or personnel to transcribe the statement at the hospital, they told the [petitioner] that he would be brought to their office to give a formal statement upon his release from the hospital.

The next day the [petitioner] was released from the hospital, taken into custody, and brought to the homicide office, where he was again advised of his rights and once again signed the waiver of rights form before giving the second statement, which was transcribed. Lieutenant Miller said that the [petitioner]'s story changed slightly in the written statement, in that he identified his accomplices as "Frank" and "Woo," instead of "Buck" and an unknown individual. He stated that the [petitioner] told them that he, Frank, and Woo formulated the plan for robbing the grocery store after talking about how they needed money, that Frank had a .22 pistol with him, and that they stopped and got a shotgun, which the [petitioner] had with him during the robbery.

The portion of the [petitioner]'s statement in which he described the robbery itself reads as follows:

> Woo went in first, I went in behind Woo and Frank came in last behind me. Me and Woo walked to the drink machine and Woo grabbed a drink. He walked back up to the front. I up the gauge on the guy and he grabbed it. We were wrestling for less than two minutes. The guy turned around and he was facing away from me while both our hands were up in the air holding the gun. Frank was still standing by the door. When me and the guy had our hands up in the air on the gun that is when Frank shot. I am not sure how many times, maybe four or

-6-

five. The guy was about to reach for the .357, but I grabbed it and he took the shotgun from me. He shot me with the shotgun in my chest. When he hit me with the shotgun, the .357 went off but it missed him. Then we all took off and ran. I got outside and I dropped the .357, jumped the gate, then I fell because I realized I had been hit. I looked up and everybody was gone. From there I walked to the fire station.

Lieutenant Miller testified that, beginning with the first interview, the [petitioner] was advised of his rights a total of four times before the written statement was made. He said that the guardian ad litem was not present for the second statement but that Sergeant Luckett had talked to the [petitioner]'s mother and obtained her permission for them to interview the [petitioner]. On cross-examination, he testified that an attempt was made to contact the [petitioner]'s parents or guardian before the first interview but that it was not done by himself.

Dr. Miguel Laboy, a medical examiner employed with the Shelby County Forensic Medical Center, which performed the autopsy of the victim's body, testified that the victim sustained three gunshot wounds: a gunshot wound to the left side of the chest that damaged his heart and lungs; a gunshot wound to the right groin region that fractured his pelvis; and a gunshot wound to the back of the left forearm. He said that the victim probably died within seconds of the gunshot wound to the chest, which was consistent with a wound caused by a high velocity weapon such as a .357 handgun. He stated that the other two gunshot wounds were not consistent with ones fired by a high-velocity weapon.

The [petitioner] elected not to testify but presented two witnesses in his behalf: Leslie Bailey, his mother; and Cathy McNamee Wilson, his aunt. Bailey testified that she spoke with the police a couple of days after the incident but did not recall giving them permission to take a statement from the [petitioner]. Wilson testified that someone from the police department telephoned to ask her questions about the [petitioner] but that she did not give anyone permission to speak with or take a statement from him.

In rebuttal, the State presented Lieutenant James Luckett of the Memphis Police Department, who testified that in January 2005 he was a sergeant assigned to the homicide bureau and the case coordinator for the Little Star Grocery murder investigation. He said that both the [petitioner]'s

mother and aunt called him on the afternoon after the [petitioner]'s initial interview at the hospital. According to Lieutenant Luckett, both women gave him permission to talk with the [petitioner] "because they wanted him to tell [the police] who was with him, so he wasn't doing this by himself."

Id. at *1-5.

The petitioner filed a petition for post-conviction relief, as well as an amended petition, in which he raised several allegations of ineffective assistance of trial counsel. The post-conviction court conducted an evidentiary hearing, at which Cathy Wilson, the petitioner's aunt, testified that she was the petitioner's guardian when he committed the crimes in this case. At that time, the petitioner was sixteen-and-a-half years old and was living with her in her Shelby County home. After the petitioner was missing from home for two or three days, Wilson learned through friends that the petitioner was in the hospital. Wilson went to the hospital to find out why the petitioner was there, but she was not allowed to see him and not told anything.

Wilson testified that she also learned that the petitioner had been arrested through information from friends, and the police did not contact her with regard to the petitioner's arrest or to receive permission to interrogate the petitioner. She did not know that the police had questioned the petitioner while he was in the hospital. Wilson said that she was not present at a suppression hearing in November 2006 because she was not aware of the hearing. The only contact she had with trial counsel was at the petitioner's trial.

The petitioner testified that he was sixteen years old at the time of the offenses and was living with his legal guardian, his aunt, Cathy Wilson. On the night of the offenses, he received a gunshot wound to the chest and was "helped" to a fire station. From the fire station, he was taken to the hospital known as "The Med," where his gunshot wound was treated and he was given the pain medication, Percocet. He was also questioned by the police while at the hospital. The questioning occurred in his hospital room, less than twenty-four hours after he arrived, and without anyone else present. He was not given the opportunity to speak with Wilson or his parents.

The petitioner testified that trial counsel represented him at a pretrial hearing regarding a motion to suppress his statement. Before the hearing, the petitioner provided counsel with the contact information for Wilson and his mother. He also told counsel the name of the hospital where he had been treated and the medications he was given. Counsel did not call Wilson, his mother, or any medical staff from the hospital to testify as witnesses at the suppression hearing. The trial court denied his motion to suppress and, after trial, he "was sentenced to fifty-one years to life."

On cross-examination, the petitioner acknowledged that trial counsel met with him "[f]rom time to time" during the time before the motion to suppress and during the trial. They went over the facts of the State's case against him. He gave counsel the names of witnesses who could be called at trial, but he did not know that he "could have witnesses at [his] suppression hearing[.]" Counsel called Wilson and his mother to testify on his behalf at the trial but did not call any witnesses at the suppression hearing. At trial, Wilson and his mother testified "[a]bout the statement stating that they had never heard anything from the police about [his] being arrested."

Trial counsel testified that he had practiced law for a "little over ten years," and his practice focused primarily on criminal law. Before being appointed to represent the petitioner, counsel had represented two other individuals in first degree murder cases and had gone to trial on those cases. After being appointed to represent the petitioner, counsel met with him a number of times, including at least four jail visits. Counsel received discovery materials from the State and went over those with the petitioner. Counsel and the petitioner discussed the allegations against the petitioner and whether there were any potential witnesses. Counsel was provided contact information for the petitioner's mother, who was in California, and the petitioner's aunt, Wilson. Counsel said that, while he did not speak to the petitioner's mother, he "certainly had conversation with the aunt prior to the motion to suppress."

Trial counsel testified that, in preparation for the suppression hearing, he reviewed the discovery materials and unsuccessfully attempted to locate the guardian ad litem who had been involved to some extent in the petitioner's case. Evidently, the police officers initially spoke to the petitioner in the hospital and "began discussions with him" but did not take a formal statement. The officers later returned with a guardian ad litem and took a statement from him. In the motion to suppress counsel filed, he argued that the petitioner's statement should be suppressed due to the petitioner's lack of experience with the criminal justice system, young age, and lower I.Q. Counsel also asserted that the guardian ad litem was not a proper person to stand in as an interested party and that "they had no proof [the guardian ad litem] had any kind of legal training where they could actually advise [the petitioner]" concerning his Miranda rights.

Trial counsel testified that no witnesses were called on the petitioner's behalf at the suppression hearing. They discussed the possibility of having the petitioner testify but decided not to because he was potentially a trial witness. Counsel made the strategic decision not to call the petitioner's aunt because "strategically, the idea was, 'Well, you will have someone to attack the statement later if the statement comes in.'" In retrospect, counsel questioned if "perhaps maybe [they] should have put all of [their] eggs in one basket; but the idea, under Callahan, is was there an interested party there." Moreover, counsel believed

that the credibility of the police concerning whether they spoke to Wilson or the petitioner's mother was a factual dispute better suited to the trial defense and not the motion to suppress under Callahan. Counsel admitted that, in hindsight, "considering the way certain things came out at trial, including having a codefendant turn and come and testify against him, perhaps we could have sort of changed the direction of the case if we had brought in more - if, somehow, the motion to suppress would have been successful."

Trial counsel testified that the State put on witnesses at the suppression hearing to testify concerning the efforts taken to contact a parent or guardian of the petitioner. Although there was a factual dispute as to whether the officers contacted Wilson or the petitioner's mother and what efforts were made, "[t]he detectives seemed pretty clear . . . that they felt like they had made efforts when they could, and that is when they went to get the guardian ad litem." Counsel was aware that detectives tried to contact Wilson "but were unsuccessful initially and then later had [a] discussion with [her]."

Trial counsel testified that, at trial, he called Wilson and the petitioner's mother to attack the credibility of the detectives as well as the statement itself. Counsel thought that the jury should have viewed the petitioner's statement very suspiciously because of "a discrepancy between what the officers were saying that they did as steps and preparation for this statement versus what the lay witnesses were saying." Counsel believed that the statement was "very questionable." However, one of the co-defendants ended up testifying against the petitioner. Additionally, there was physical evidence linking the petitioner to the scene, including the fact that the petitioner was shot and found at a fire station close to the scene. As such, there was testimony and circumstantial evidence linking the petitioner to the crimes in addition to the petitioner's statement of confession.

Trial counsel testified that, on appeal, he attacked the trial court's denial of his motion to suppress, as well as the "use of the family member's statement that they didn't want [the [petitioner] to go down alone" because such statement may have "tainted the jury in that a family member had already found this person guilty in their mind[.]" However, counsel said, the Court of Criminal Appeals found no error and affirmed the judgments.

On cross-examination, trial counsel testified that he thought "the only way that case would have not ended up in trial is if somehow that statement would have been suppressed and the [S]tate would have looked at whether they wanted to go forward with what they had."

On questioning by the court, trial counsel said that he did not believe that the trial court's ruling would have changed had the petitioner's aunt and mother testified at the suppression hearing as they testified at the trial.

In denying relief, the post-conviction court found that counsel made a reasonable strategic decision to focus his attack at the suppression hearing on the petitioner's young age, lower I.Q., and inexperience with the criminal justice system instead of calling witnesses to support his factual basis for suppression and that the petitioner failed to prove that he was prejudiced by counsel's not calling said witnesses. The court also found that the petitioner failed to offer adequate proof concerning his allegations that counsel was ineffective in failing to request alternative jury instructions regarding "accidental shooting" and in failing to investigate the petitioner's medical records. The court lastly found, regarding the petitioner's contention that counsel was ineffective in failing to have the petitioner testify at the suppression hearing, that counsel and the petitioner had made the joint decision to not have the petitioner testify at the hearing because he was a potential trial witness and that the petitioner failed to prove how the alleged error prejudiced his trial.

## ANALYSIS

On appeal, the petitioner argues that the post-conviction court erred in denying his petition because he received the ineffective assistance of counsel. Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the trial court's findings as to the credibility of witnesses or the weight of their testimony. Id. However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App.

1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The same principles apply in determining the effectiveness of trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995).

The petitioner argues that trial counsel rendered ineffective assistance by failing to call witnesses to testify at his motion to suppress hearing. However, the petitioner has failed to show that counsel performed deficiently or that any deficiency caused him prejudice. Trial counsel testified that he filed a motion to suppress on the grounds that the petitioner was inexperienced with the criminal justice system, had a lower I.Q., a young age, and the fact that the guardian ad litem was not a proper interested party. Counsel said that he made the strategic decision to not call Wilson, the petitioner's aunt, as a witness at the suppression hearing because he felt that the factual dispute between the detectives' claim that they obtained permission to question the petitioner from Wilson and her denial was better suited to the trial defense. Counsel called Wilson and the petitioner's mother at trial to attack the credibility of the detectives as well as the petitioner's statement itself. At the evidentiary

hearing, counsel surmised that the trial court's ruling would have been no different had the petitioner's aunt and mother testified at the suppression hearing as they testified at the trial. The post-conviction court found that counsel made a reasonable strategic decision regarding how to handle the suppression issue, and it is not our role to second-guess counsel's strategy. The petitioner, therefore, has failed to prove that counsel performed deficiently.

Moreover, the petitioner has failed to show that any alleged deficiency caused him prejudice. As trial counsel noted at the evidentiary hearing, there was testimony and circumstantial evidence linking the petitioner to the crimes in addition to his statement. Specifically, a co-defendant testified against the petitioner, and the physical evidence of the petitioner appearing at a fire station near the scene suffering from a gunshot wound linked the petitioner to the crimes. As such, the petitioner failed to show a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE